# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> DEVONTA COBBS, <br><br> Defendant. | Case No. 22-CR-4069-LTS-KEM <br><br> **REPORT AND RECOMMENDATION** |

Defendant Devonta Cobbs moves to suppress evidence seized from him during a traffic stop, as well as evidence seized from his residence pursuant to a search warrant. Doc. 26. I recommend suppressing the evidence seized from the traffic stop, but not from the residence. Accordingly, I recommend **granting in part and denying in part** the motion to suppress (Doc. 26).

## I. BACKGROUND

Law enforcement began investigating Cobbs in conjunction with a shooting that occurred on May 14, 2022. On that date, Sioux City Police Department Sergeant Joshua Tyler spoke with the victim of the shooting, Jordan Hills, and learned of Cobbs's and Vince Verzani's possible involvement in the shooting. When Sergeant Tyler happened to see Cobbs and Verzani at a birthday party later that day while off duty, he alerted other officers and left the party to conduct surveillance. Ultimately, Cobbs and Verzani left the party in separate vehicles, and Sergeant Tyler conducted a traffic stop of Verzani and directed other officers to stop Cobbs.

Sioux City Police Officer Casey McBride pulled Cobbs over without knowing the reason for the stop. Several other officers arrived on the scene, including Sioux City Police Department Sergeant Paul Yaneff. Cobbs was detained for about thirty minutes

without being informed of the reason for the stop. Sergeant Tyler ultimately directed officers to transport Cobbs to the police station downtown for questioning. Law enforcement conducted a *Terry*[1] pat-down of Cobbs's person and searched his car, seizing two cell phones and a .40-caliber Glock firearm.

A few weeks later, law enforcement obtained a search warrant for Cobbs's residence and cell phones. *See* Def. Ex. E, G. The affidavits in support of the warrants included information from Verzani's May 2022 interview with law enforcement (conducted after Cobbs was taken to the police station for questioning); as well as a later interview with Victor Howard, who said that he had sold a 10mm caliber Glock firearm to Cobbs with Verzani present (the casings recovered on the scene of the shooting were consistent with a 10mm caliber firearm).

Cobbs moves to suppress evidence seized from his person and vehicle during the traffic stop on May 14, 2022. Docs. 26, 26-1. He also moves to suppress evidence seized pursuant to the search warrant. *Id.* The Government filed a resistance (Doc. 31), and Cobbs filed a reply (Doc. 37).

I held a hearing on the suppression motion on March 23, 2023, at which Sergeants Tyler and Yaneff testified. Doc. 50. I also admitted the following exhibits under seal:

- Defendant's Exhibit A – Officer McBride's police report;
- Defendant's Exhibits B and D – Pictures of traffic stop;
- Defendant's Exhibit C – Sergeant Tyler's police report;
- Defendant's Exhibit E – Search warrant for Cobbs's residence;
- Defendant's Exhibit F – Police report related to seizing the .40 caliber Glock from Cobbs's car;
- Defendant's Exhibit G – Search warrant for Cobbs's cell phones;
- Defendant's Exhibit H – Property information sheet related to items seized in May 2022;

---

[1] ***Terry v. Ohio***, 392 U.S. 1 (1968).

- Defendant's Exhibits I and P – Excerpts of video recordings of Sergeant Tyler's May 2022 interview with Verzani;
- Defendant's Exhibit J – Video recording of Sergeant Tyler's interview with Victor Howard;
- Defendant's Exhibit K – Video recording from Officer McBride's body camera;
- Defendant's Exhibit L – Police report of officer on the scene of shooting who recovered casings consistent with the use of a 10mm caliber firearm; and
- Defendant's Exhibits M, N, and O – State-court orders related to Verzani and Howard.

## II. INITIAL STOP OF COBBS'S VEHICLE

The Fourth Amendment protects people "against unreasonable searches and seizures."[2] "A traffic stop is a seizure and 'must be supported by reasonable suspicion or probable cause.'"[3]

> "A reasonable suspicion is a 'particularized and objective' basis for suspecting criminal activity by the person who is stopped." Reasonable suspicion is determined by "looking at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing based on his own experience and specialized training to make inferences from and deductions about the cumulative information available." "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard."[4]

---

[2] **U.S. Const. amend IV**.

[3] *United States v. Martin*, 15 F.4th 878, 881 (8th Cir. 2021) (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008), *cert. denied,* 142 S. Ct. 1432 (2022).

[4] *Id.* at 883 (cleaned up) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005); *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015)).

Here, Sioux City Police Officer Casey McBride initiated the traffic stop of Cobbs at the direction of other officers. *See* Def. Ex. A. He did not have any information on the reason for the stop. *Id.* But "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers."[5]

Nevertheless, Defendant argues that the collective knowledge of the officers, including Sergeant Tyler, does not rise to the level of reasonable suspicion. Earlier in the day, Sergeant Tyler spoke to Jordan Hills, the hospitalized victim of a shooting that had occurred that morning.[6] Hills said that he had been the passenger in a black Chevy car driven by Brianna Verzani with a friend known only as "Nasty" in the backseat. Hills indicated that they were being followed by a light blue minivan with a white female passenger in the front seat; he said he did not know the driver of the minivan, a white male, but Brianna said it was her brother. Brianna pulled over, and Hills stated he and "Nasty" exited the vehicle with their hands raised. The driver of the blue minivan then shot him.

Sergeant Tyler identified Brianna's brother as Vince Verzani. He showed Hills a picture of Verzani pulled from social media, and Hills identified him as the shooter. Sergeant Tyler also learned that Verzani's girlfriend, a white female, owned a blue minivan matching the description of the one driven by the shooter.

As for Cobbs's involvement in the shooting, Hills told Sergeant Tyler he had heard "Scoota" or "Scooter" was involved in the shooting. Hills did not know "Scooter's" real name, but indicated he drove a black Charger with red seats (matching the description of Cobbs's car). When Sergeant Tyler showed Hills a picture of Cobbs from social

---

[5] ***United States v. Thompson***, 533 F.3d 964, 969 (8th Cir. 2008).

[6] The facts in this and the next three paragraphs are taken from Sergeant Tyler's police report (Doc. 27-3) and his testimony at the suppression hearing.

media, Hills confirmed Cobbs was the person he knew as "Scooter." Hills denied that he had seen Cobbs or his car at the time of the shooting, however. Sergeant Tyler's police report indicates that Cobbs's "involvement is that [he] is commonly with [Verzani]." Def. Ex. C. A confidential informant provided similar information—that "Scooter" drove a black Charger with red leather seats and that Scooter and Verzani were "involved" in the shooting, but it was unclear how.

Sergeant Tyler attended a birthday party at a rural residence off-duty later that day, at which more than fifty people were present—including Verzani, his girlfriend, and Cobbs. Sergeant Tyler left the party and contacted other officers to conduct surveillance. He observed both a light blue minivan and a black Charger with red seats parked at the party. Sergeant Tyler testified he learned at this time that Cobbs's license was suspended. Law enforcement observed Verzani, his girlfriend, and Cobbs leaving the party at the same time; Verzani and his girlfriend drove off in the light blue minivan and Cobbs in the Charger. At this time, Sergeant Tyler directed Officer McBride to stop Cobbs, and he initiated a traffic stop.

I do not find that law enforcement had reasonable suspicion to stop Cobbs related to the shooting. Two people—a confidential informant (who we know nothing about) and the victim—had heard that Cobbs was somehow involved in the shooting. Law enforcement knew that neither Cobbs nor his vehicle had been on the scene of the shooting, and they had no information on how Cobbs could possibly be involved otherwise. Sergeant Tyler's police report suggests that Cobb's involvement amounted to being friends with the shooter—and indeed, Sergeant Tyler placed undue significance on the fact that Cobbs was at a party with the shooter, along with dozens of others (including himself). "Mere association with a known criminal cannot on its own be a basis for a 'reasonable suspicion.'"[7]

---

[7] *United States v. Coggins*, 986 F.2d 651, 655 (3d Cir. 1993) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also Ford v. Dowd*, 931 F.2d 1286, 1293 (8th Cir. 1991) (favorably

5

The Government contends that even if law enforcement lacked reasonable suspicion to investigate Cobbs for the shooting, probable cause for the stop existed because Cobbs was driving with a suspended license. An officer's "[s]ubjective intent is not determinative in deciding whether the stop was reasonable."[8] "'Even if an officer invokes the wrong offense' at the time, probable cause may still support the stop if an officer has an objective basis to make it."[9] Cobbs does not seriously dispute that his suspended license provided law enforcement with probable cause to initiate a traffic stop.[10] Thus, I recommend rejecting Cobbs's argument that the initial stop of his vehicle violated the Fourth Amendment.

### III. SEARCH OF THE VEHICLE

After pulling Cobbs's vehicle over using his blue lights, Officer McBride asked Cobbs to step out of the vehicle.[11] Officer McBride conducted a *Terry* pat-down. Cobbs

---

citing district court case holding "information that police officer associates with drug dealers does not rise to the level of reasonable suspicion of drug use").

[8] *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021) (quoting *United States v. Mallari*, 334 F.3d 765, 767 (8th Cir. 2003)).

[9] *Id.* (quoting *United States v. Demilia*, 771 F.3d 1051, 1054-55 (8th Cir. 2014)) (upholding traffic stop based on officers' search of National Crime Information Center (NCIC) database prior to stop, which provided reasonable suspicion that vehicle lacked proper registration, even though officers initiated traffic stop based on improper lane change that the lower court ultimately found to be legal under Nebraska law).

[10] Instead, Cobbs argues that law enforcement unreasonably delayed the traffic stop, as he was stopped for thirty minutes without law enforcement conducting any investigation into his suspended license (or the shooting, for that matter). I do not find this argument forfeited, as the Government argued at the hearing—although first raised in Cobbs's reply brief, Cobbs had no way of knowing that the Government planned to argue a suspended license justified the stop, as it is not mentioned in the police reports, and law enforcement did not question Cobbs at the scene about his license. Nevertheless, I decline to address this issue, since I ultimately find law enforcement lacked probable cause to search Cobbs's car and seize the cell phone from his person (as discussed in the next section).

[11] The facts in this and the next two paragraphs are taken from Officer McBride's body camera video (Def. Ex. K) and Sergeant Yaneff's testimony at the suppression hearing unless otherwise

6

asked whether he did anything wrong, and Officer McBride responded that he was directed to pull the vehicle over but had no additional information. Officer McBride asked about Cobbs's day, and they discussed riding 4-wheelers. Six minutes into the stop, other officers began arriving on the scene. None of these officers knew the reason for the stop, and everyone continued to stand around and chit chat without asking Cobbs any questions related to his license or the shooting. Thirteen minutes into the stop, Cobbs was subjected to a second *Terry* pat-down, handcuffed, told he was being detained but was not under arrest, and had his cell phone seized. Law enforcement indicated he might be taken to the police station downtown. Cobbs asked whether he had a choice, and the officer responded that he was currently being detained and that they were waiting to hear what to do. Eighteen minutes into the stop, law enforcement read Cobbs his *Miranda*[12] rights. Law enforcement on the scene continued to shoot the breeze with Cobbs, unaware of why he was being detained. Finally, about thirty minutes into the stop, law enforcement heard from Sergeant Tyler and told Cobbs that he would be transported downtown for questioning.

Sergeant Tyler directed law enforcement to search Cobbs's vehicle for evidence related to the shooting, noting that no firearm had been recovered from the search of the blue minivan.[13] Officer McBride asked Cobbs whether he would find "anything" in his car, and Cobbs indicated he had a weapon, a .40 caliber Glock, in the glove compartment. He denied any other weapons. Law enforcement had recovered 10mm caliber casings from the scene of the shooting earlier in the day. *See* Def. Ex. L. Cobbs was then taken

---

noted.

[12] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[13] Sergeant Tyler had followed Verzani and his girlfriend in the blue minivan when they left the party at the same time as Cobbs in the Charger and went separate directions. Sergeant Tyler then directed a deputy to stop the minivan, and during a consent search of the minivan, officers did not locate a firearm. At that point in the investigation, Officer Tyler knew 10mm caliber casings had been recovered from the scene of the shooting, but was not certain what firearm had been used.

to the police station while law enforcement searched his car. They seized the firearm and a second cell phone as a result of the search.

Cobbs argues that law enforcement lacked probable cause to search his car.

> [T]he automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." A combination of otherwise innocent factors may create probable cause. Because "probable cause is a practical and common-sensical standard," "an officer may draw inferences based on his own experience" to determine whether probable cause exists.[14]

I have already found that at the time of the initial stop, law enforcement did not even have reasonable suspicion connecting Cobbs to the shooting. By the time of the search, law enforcement additionally knew that no firearm had been found in the blue minivan and that Cobbs admitted to possessing a different caliber firearm than the shell casings recovered from the scene of the shooting. Although Sergeant Tyler testified at the suppression hearing that 10mm caliber ammunition could be shot from different caliber firearms, this additional evidence still did not provide law enforcement with probable cause to search Cobbs's car for evidence of the shooting. And even though law enforcement had probable cause that Cobbs was driving with a suspended license, they did not have probable cause that evidence relevant to that crime would be found in Cobbs's vehicle.[15]

---

[14] *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) (cleaned up) (quoting *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017)).

[15] *See Arizona v. Gant*, 556 U.S. 332, 344 (2009) (when law enforcement arrested defendant for driving with a suspended license, holding search of vehicle violated Fourth Amendment, as "police could not reasonably have believed either that [defendant] could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein").

In its brief, the Government largely relied on the smell of marijuana in Cobbs's vehicle as providing the requisite probable cause. But as the Government conceded at the hearing, Sergeant Yaneff testified that he did not smell marijuana until *after* searching Cobbs's vehicle and seizing the firearm. And law enforcement had no evidence that Cobbs was prohibited from possessing firearms or that his admitted firearm possession was otherwise illegal.

The search of Cobbs's vehicle and seizure of the firearm and cell phone violated the Fourth Amendment, as police lacked probable cause for the search. I also find that law enforcement lacked probable cause to seize Cobbs's cell phone from his person during the *Terry* pat-down on the scene of the traffic stop. Accordingly, I recommend that the .40 caliber Glock and evidence from the cell phones be suppressed.[16]

### IV.  SEARCH WARRANT

Cobbs challenges whether the search-warrant affidavit supports a finding of probable cause. In accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed."[17] Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence."[18] "Not only may an issuing judge 'draw reasonable inferences from the

---

[16] The Government does not argue that any other exceptions apply justifying admission of this evidence.

[17] *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord* **United States v. Buchanan**, 574 F.3d 554, 561 (8th Cir. 2009).

[18] *United States v. Faulkner*, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016).

9

totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences . . . .'"[19]

The search warrant for Cobbs's residence authorized the search and seizure of ammunition, firearms, paraphernalia related to drug use or distribution, and digital storage devices that "could contain photographs and/or video supporting the possession or distribution of controlled substances or firearms" (among other things). Def. Ex. E. Sergeant Tyler's affidavit in support of the warrant concluded that he sought "evidence of drug use, drug distribution, firearms possession, [and] firearms distribution." *Id.*

Cobbs argues that nothing in the affidavit establishes that he was involved in distributing firearms and drugs (as opposed to mere possession). I disagree. The affidavit provides probable cause that Cobbs supplied Verzani with the firearm used in the shooting, stating:

- Howard told law enforcement he sold Cobbs a 10mm caliber Glock for $1,200 at Verzani's residence with Verzani present (it is unclear whether the sale occurred when Cobbs was still living at the residence or after Cobbs had moved out);
- Law enforcement recovered casings from a 10mm caliber firearm at the scene of the shooting;
- Verzani told officers that he used a 10mm caliber Glock to shoot Hills; and
- After learning Howard talked to law enforcement, Verzani called law enforcement to confirm that the firearm he used in the shooting did not belong to Verzani and that Howard had sold Cobbs the weapon.

The affidavit also provided probable cause that Cobbs possessed firearms and used marijuana (even excluding evidence from the traffic stop). It stated that text messages

---

[19] *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

from Verzani and his girlfriend supported that Verzani let Cobbs use his firearms. It also included two photos of Cobbs taken from social media in which he appeared to be smoking marijuana, as well as a photo of Cobbs sitting and pointing a firearm at the camera with at least $1,500 in cash strewn about his feet (and probably more like $3,000).

In any event, even if the evidence of possessing firearms, marijuana, and a large amount of cash did not create probable cause that Cobbs was involved in distributing drugs, its inclusion in the warrant and affidavit had no effect on the search of Cobbs's residence.

> It is well established that a search warrant for evidence allows law enforcement to search anything or anywhere on the premises where that evidence might be. "If law enforcement officers are looking for a canary's corpse, they can search a cupboard, but not a locket. If they are looking for an adolescent hippopotamus, they can search the living room or garage but not the microwave oven."[20]

The plain-view doctrine authorizes officers to seize plainly incriminating evidence.[21] Thus, the Eighth Circuit has held that when a search-warrant affidavit established probable cause to search for evidence of drug dealing, any overbreadth in the warrant authorizing the search and seizure of firearms "when there was no evidence . . . of firearm ownership or trafficking" was irrelevant.[22] The court reasoned that probable cause existed to search for drugs; drugs could be stored any place firearms were; and firearms could be seized under the plain-view doctrine, since the defendant was a felon.[23] Here, as discussed, the officers had probable cause to search Cobbs's residence for firearms, drugs, and evidence of firearms distribution. Evidence of drug distribution

---

[20] *United States v. Kruse*, 603 F. App'x 512, 516 (8th Cir. 2015) (cleaned up) (quoting *United States v. Evans*, 92 F.3d 540, 543 (7th Cir. 1996)).

[21] *Id*. at 516-17.

[22] *Id.*

[23] *Id.*

would be "plainly incriminating" such that it could be seized under the plain-view doctrine.

I recommend rejecting Cobbs's argument that the search warrant affidavit did not establish probable cause to search his residence.

## V. *FRANKS*

Cobbs challenges the misleading nature of several statements in the warrant affidavit. When a judge issues a search warrant based on "on an affidavit containing false or omitted statements, the resulting search warrant may be invalid."[24] To invalidate the warrant, the defendant must show, by a preponderance of evidence, (1) that the affiant acted intentionally or with reckless disregard in making the false statement or material omissions, and (2) that the affidavit would not support a finding of probable cause if the false statements were left out of, or the material omissions were included in, the affidavit.[25] This standard comes from the Supreme Court's decision in *Franks v. Delaware*.[26]

To be entitled to a *Franks* hearing, "a defendant must make a substantial preliminary showing that includes 'allegations of deliberate falsehood or of reckless disregard for the truth.'"[27] "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements."[28] This requirement is based on "a presumption of validity with respect to the affidavit supporting the search warrant."[29] "Because a warrant

---

[24] *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

[25] *Id.*

[26] 438 U.S. 154 (1978).

[27] *Williams*, 477 F.3d at 557 (quoting *Franks*, 438 U.S. at 171).

[28] *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015).

[29] *Williams*, 477 F.3d at 558.

12

application need only show facts establishing probable cause, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause."[30] Put another way, the defendant must show that probable cause would not have existed if the false information had been omitted from the affidavit, or if the omitted information had been included in the affidavit.[31] If the affidavit would still provide probable cause to issue a search warrant, the defendant fails to make the necessary preliminary showing for a *Franks* hearing.[32]

Cobbs challenges several statements in the affidavit that he argues omit information, making them misleading. With respect to the evidence discussed in the previous section, he argues the affidavit omitted that Verzani's and Howard's criminal histories prohibited them from possessing firearms; that when law enforcement asked Howard who he knew that sold firearms, he named several people, but not Cobbs; and that Verzani provided information about the firearm used in the shooting during his May 14 interview inconsistent with his later statement. Specifically, during the interrogation on May 14, Verzani stated he purchased the firearm used in the shooting at his residence for $1,000 from a skinny black male with dreads who he knew as his friend Reggie's cousin (Howard later confirmed he is Reggie's cousin). *See* Ex. C; Ex. I, 9:57-11:45. In addition, although Verzani identified someone to whom he had sold a gun in the past, as well as several people he believed sold firearms, he did not name Cobbs. During the May 14 interview, Verzani also identified the person to whom he had given the gun used in the shooting (who was not Cobbs). Ex. P. Cobbs also challenges other statements—that he was found with the shooter and passenger the day of the shooting (without saying it was at a party with over fifty other people present, including Sergeant Tyler); that the

---

[30] *United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (cleaned up).

[31] *See Gonzalez*, 781 F.3d at 431.

[32] *Id.*; *see also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013).

victim said Cobbs was somehow involved in the shooting (without saying the victim did not see Cobbs at the scene); that officers seized a Glock firearm from Cobbs's vehicle the day of the shooting (making it seem like it was the firearm used in the shooting without saying that it was of a different caliber than the casings recovered and that Verzani said he gave the firearm to someone else after the shooting); and that Cobbs told Verzani Hills's location for the shooting (without clarifying that Cobbs only said that Hills was driving around with Verzani's sister, which is the same information another individual had told Verzani that morning).

Although some of this information should have been included in the affidavit—particularly Verzani's prior inconsistent statements about how he obtained the firearm, as well as the information clarifying Cobbs's connection to the shooting—it is not "clearly critical" to the probable-cause determination such that it renders the affidavit invalid under *Franks*. Even if the affidavit included this information, the affidavit would still establish probable cause that Cobbs supplied Verzani with the firearm used in the shooting and that he generally possessed marijuana and firearms. Because the warrant affidavit provided probable cause to search Cobbs's residence for evidence of drugs and firearms, even with the omitted material included, no *Franks* violation occurred.[33]

Accordingly, I recommend rejecting Cobbs's *Franks* challenge to the warrant.

### VI. CONCLUSION

I recommend **GRANTING IN PART AND DENYING IN PART** Cobbs's motion to suppress (Doc. 26). I recommend granting the motion to suppress evidence from the search of Cobb's person and vehicle following the traffic stop. I recommend

---

[33] Cobbs also argues that his connection to the shooting was much weaker than it appeared from the warrant affidavit. I agree, but I ultimately find that even if all omissions were included, the affidavit would still contain probable cause that Cobbs used marijuana, possessed firearms, and supplied Verzani with the firearm used in the shooting.

denying the motion as to evidence seized from Cobbs's residence during execution of the search warrant.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[34] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[35] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[36]

**DATED** May 26, 2023.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[34] **LCrR 59**.

[35] *See* **Fed. R. Crim. P. 59**.

[36] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).